**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DOMAIN VAULT LLC,** | § | |
| *Plaintiff,* | § | **Civil Action** |
| **v.** | § | |
| | § | **No.** _____ |
| **RIGHTSIDE GROUP, LTD,** | § | |
| *Defendant.* | § | |

## COMPLAINT

## 1. PARTIES

**1.1.** Domain Vault LLC, a Virginia limited liability company, is **plaintiff**.

**1.2.** Rightside Group, Ltd., ("Rightside"), a Delaware corporation with offices in Kirkland, Washington and Austin, Texas, is **defendant**.  Its registered agent in Delaware is Registered Agent Solutions, Inc., 1679 S. Dupont Hwy. Ste. 100, Dover, DE 19901.

## 2. JURISDICTION

**2.1.** The U.S. District Court has Federal Question jurisdiction over this case pursuant to 28 U.S.C. §1331, Supplemental jurisdiction pursuant to 28 U.S.C. §1367(a), and Diversity jurisdiction pursuant to 28 U.S.C. §1332.

### 3. <u>SUMMARY OF ACTION</u>

**3.1.**  When the U.S. District Court for the Northern District of Texas wound down the 'Netsphere receivership', a group of individuals, (the 'Baron group'), associated in an enterprise to gain control of the receivership assets.

**3.2.**  The Baron group claimed to hold authority over two receivership entities, Novo Point, LLC and Quantec, LLC and demanded that the Court award them the entities' receivership assets.  The Baron group claimed that they had taken control of the LLCs and had fired the LLCs' operations manager, (and court recognized representative), Lisa Katz, as well as counsel for the LLCs, Christopher Payne.

**3.3.**  The Court ruled against the Baron group and ordered that the receivership assets be placed under Katz' authority.

**3.4.**  Further, the Court ruled that any attempt to interfere with Katz' authority over the assets by persons acting on Baron's behalf would be considered contempt of the Court's orders.

**3.5.**  Prior to the wind-down, the Netsphere Receiver was concerned by Baron's threats to interfere with the Court's orders concerning transfer of receivership domain name assets.[1]  To ensure that the domain names would stay under the jurisdiction of the Court, the Receiver moved the registration of domain names to a subsidiary of Rightside Group Ltd., "name.com".

**3.6.**  Pursuant to the Court's orders rejecting the Baron group's claim to the assets, in March 2014, the Court's Receiver directed name.com "to handover portfolio authority <u>solely to Ms. Katz</u>."

**3.7.**  Based thereon, Domain Vault LLC purchased domain names through Lisa

---

[1]  The internet uses a "Domain Name System" (DNS) to easily make connections between computers.  A name registered in the DNS is a "domain name".   The receivership assets included tens of thousands of domain names, such as "cellbiology.com".

Katz, the party that the United States District Court ordered authorized to control the assets.

**3.8.** At that point, the Baron group worked vigorously to thwart the U.S. District Court's orders awarding Katz authority over the domain names. The Baron group solicited Rightside Group Ltd.'s participation in their efforts. Rightside Group agreed to participate and directed its subsidiary, name.com, to disregard the Court's orders.

**3.9.** Within 7 business days after being directed by the Court's Receiver to turn over authority to Katz, Rightside Group brazenly thwarted the U.S. District Court's orders and directed its subsidiary, name.com, to interfere with Katz' control over the domain names and to freeze the domain names Katz sold to Domain Vault LLC.

**3.10.** In conjunction with working to thwart the orders of the U.S. District Court, Rightside Group successfully engaged in wire fraud to delay enforcement action against it. Rightside fraudulently represented to Domain Vault LLC (and others) that (i) it took control over the domain names pursuant to ICANN[2] rules, and (ii) it would cease its interference when the Collin County District Court ruled on the lawsuit filed by the Baron group in Collin County, Texas, challenging Katz' authority.

**3.11.** When Rightside Group represented that its interference with the domain names would cease when the Collin County court ruled on the lawsuit, Domain Vault LLC reasonably relied upon Rightside Group's representations. Domain Vault was not aware that Rightside Group was acting pursuant to private arrangements made with the Baron group.

---

[2] The Internet Corporation for Assigned Names and Numbers.

**3.12.**  Rightside Group's participation in the Baron group's enterprise was exposed when the claims in the Collin County lawsuit were adjudicated against the Baron group.

**3.13.**  Instead of complying with the U.S. District Court's orders when the Collin County court adjudicated the Baron group's claims, Rightside Group intransigently **continued to thwart the U.S. District Court's orders**.  That is, after Baron, et. al.'s claims were dismissed with prejudice by the Collin County District Court, Rightside Group's defiance of the U.S. District Court's order continued.

**3.14.**  As Rightside Group continues to defy the U.S. District Court's orders and to interfere with Katz' authority and sale of domain names to Domain Vault LLC, Rightside Group is causing Domain Vault LLC daily loss of over $100.00 per day at more than 1,080 websites that Rightside has shut down.   That adds up to a loss of over $108,000.00 each day**.**

**3.15.** Thus, because of the scale of the interference engaged in, Rightside Group's participation in the Baron group's enterprise to thwart the Court's orders is causing over $39 Million dollars in aggregate losses to Domain Vault LLC each year.

**3.16.**  Domain Vault pleads the following actions:

COUNT I:    Suit to enforce Court order................................page 18
COUNT II:   Interference with contract...................................page 31
COUNT III:  Civil conspiracy.......................................................page 38
COUNT IV:  Civil RICO ...............................................................page 44
COUNT V:   Conversion ..............................................................page 60

## 4. <u>VENUE</u>

**4.1.** Pursuant to 28 U.S. Code § 1391(b)(2) venue is proper in a judicial district in which a substantial part of the events giving rise to the claim occurred.

**4.1.1.** A substantial part of the events giving rise to the claims pleaded in this suit occurred in the Northern District of Texas, including Rightside Group's wire fraud which was directed at the Northern District.

**4.1.2.** The court ruling ordering Katz to have control over the Netsphere receivership assets at issue was ordered by the U.S. District Court for the Northern District of Texas.

**4.1.3.** Likewise, the court order cautioning all parties to refrain from acting on Baron's behalf to interfere with Katz' control over the assets which the Court ordered placed under Katz' control was issued by the U.S. District Court for the Northern District of Texas.

**4.1.4.** The U.S. District Court for the Northern District of Texas ordered that the Court shall retain <u>exclusive jurisdiction</u> over any disputes that may arise concerning any earlier order in the Netsphere case.[3]

**4.1.5.** Courts in other districts have found venue proper in the Northern District for issues involving or arising out of the orders of the Northern District and have recently transferred cases to the Northern District of Texas because the cases, like this one, involved orders issued in the Northern District relating to the Netsphere receivership assets.[4]

**4.2.** Pursuant to 18 U.S. Code § 1965, venue in this case is also proper in the district court of the United States for any district in which the defendant is found,

---

[3] Doc. 1447, p. 21, in Case 3:09-cv-00988-L (N.D. Tex.).

[4] E.g., Doc. 130, in Case 2:16-cv-00126-JRG-RSP, (E.D. Tex.).

has an agent, or transacts his affairs.  The defendant, Rightside Group, Ltd., has agents in the Northern District and also transacts its affairs in the Northern District, as pleaded below.

**4.3.**  Also, pursuant to 28 U.S. Code § 1391(c)(2)  an entity with the capacity to sue and be sued in its common name shall be deemed to reside, (and therefore venue proper pursuant to section 1391(b)(2)), if a defendant, in any judicial district in which such defendant is subject to the courts personal jurisdiction with respect to the civil action in question.  Pursuant to § 1391(d), in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State.

**4.3.1.**  The contacts of Rightside Group Ltd., in the Northern District of Texas would be sufficient to subject it to personal jurisdiction if the district were a separate State.

**4.3.2.**  Rightside is a ′leading domain name registry′ with a portfolio of 39 gTLDs and generates the majority of its revenue through its domain name registration subscriptions, including registrations of domain names for its owned gTLDs.  Rightside′s gTLDs are marketed and sold in the Northern District of Texas and Rightside does business in and generates substantial revenue in the Northern District of Texas.

**4.3.3.**  Rightside, directly and through agents, sends solicitation and other mail and/or email to the Northern District of Texas on a daily basis.

**4.3.4.**  Further, Rightside solicits business in the Northern District of Texas and contracts with and uses agents and resellers located in the district to sell Rightside's products.

**4.3.5.**  Rightside also conducts and solicits business in the Northern District of Texas through its website.  Further, Rightside advertises its website for the purpose of being found by searches made in the Northern District of Texas. Rightside also solicits investors in the district.

**4.3.6.**  Rightside also solicits in the Northern District of Texas for its subsidiaries and its new domains such as ".REVIEWS", ".SOCIAL", and ".ATTORNEY", and the 'rightside registry'.

**4.3.7.**  Further, Rightside's internet operations include transmission through computers located in the Northern District of Texas and Rightside routes business communications through the Northern District of Texas on a daily basis.

**4.3.8.**  Rightside also purchases products from vendors in the Northern District of Texas and banks at which Rightside has accounts are in located in the Northern District.

**4.3.9.**  Rightside also maintains offices in Texas and conducts a substantial amount of its affairs in the Northern District, including advertising, soliciting sales and making sales. Rightside also conducts and has conducted affairs through wholly owned subsidiaries which do substantial business, on a daily basis, in the Northern District.

## 5. <u>FACTUAL BACKGROUND</u>

**5.1.** When the ʹNetsphere Receivershipʹ was wound down in cause 3:09-cv-00988-L in the U.S. District Court for the Northern District of Texas,  Jeff Baron, and confederates acting in concert with him, (the "Baron group"), sought to seize control of the assets of Novo Point LLC and Quantec LLC by claiming that the Baron groupʹs David McNair was the Manager of the two companies and had fired the companiesʹ counsel, Christopher Payne and operations manager, Lisa Katz.

**5.2.** The U.S. District Court ruled against the Baron groupʹs claim of authority and awarded authority over the assets, including domain names, to Lisa Katz.

**5.3.** The Baron group immediately sought to thwart the U.S. District Courtʹs orders by contacting the companies that managed the domain names and asking them to disregard the Courtʹs orders that Lisa Katz be given control of the assets.

**5.4.** The Baron group asked portfolio managers to interfere with Katz' control of the domain names by interfering with her sale of domain names and by locking out Katz and any purchasers from access to the domain name portfolio.

**5.5.** One of the first parties that the Baron group successfully persuaded to participate in their scheme to thwart the U.S. District Courtʹs orders was ʹDomain Holdingsʹ in Florida, which immediately began withholding the income stream of the domain name assets from Katz.  The Court quickly put a stop to that and ordered Domain Holdings to make all payments to Katz.[5]

**5.6.** At that time, the Receiver reported to the Court that Baron or persons acting on his behalf also contacted and directed other various portfolio managers to disregard this court's orders regarding the turnover of receivership assets to Ms. Katz.  In response, the Court issued an order that it would deem such conduct to

---

[5] See pages 5 and 9-10 of April 10, 2014 N.D. Texas Court Order, Doc. 1395 in cause 3:09-cv-00988-L.

be a direct act to circumvent or thwart the court's orders regarding the winding down of the receivership.  Specifically, the Court ruled:

> "According to information provided by the Receiver in conjunc-
> tion with this and the LLCs' March 13, 2014 motion (Doc. 1390),
> Baron or persons acting on his behalf contacted and directed the
> various portfolio managers to disregard this court's orders
> regarding the turnover of receivership assets to the LLCs'
> designated agent Ms. Katz.  The court hopes this is not the case,
> but if it is true, the court would deem the conduct taken to be a
> direct act to circumvent or thwart the court's orders regarding the
> winding down of the receivership." [6]

**5.7.** Upon belief, the Court did not want to be bombarded with motions to compel compliance each time another actor participated in the Baron group's scheme to thwart the Court's orders.   The Court issued a ruling that if a party or person were prejudiced by the actions of Baron or persons acting on his behalf, the court would address the issue after the Netsphere receivership wind-down was completed.

**5.8.** To ensure that all affected parties, persons, entities, and attorneys complied with the court's orders and were aware of the consequences of their failure to do so, the court expressly directed their attention to the opinion in *American Airlines, Incorporated v. Allied Pilots Association*, 228 F.3d 574 (5th Cir. 2000), cert. denied, 531 U.S. 1191 (2001), in which the award of $48 Million in civil penalties for contempt of the orders of the District Court for the Northern District of Texas was affirmed on appeal to the Fifth Circuit.   Specifically, the Court ordered:

---

[6] Id. at 9-10.

> "To ensure that all affected parties, persons, entities, and
> attorneys comply with the court's orders and are aware of the
> consequences of their failure to do so, the court directs their
> attention to the opinion in American Airlines, Incorporated v.
> Allied Pilots Association, 228 F.3d 574 (5th Cir. 2000), cert.
> denied, 531 U.S. 1191 (2001)." [7]

**5.9.** The Court's warnings did not, however, deter Rightside Group from continuing to participate in the Baron group's scheme to thwart the U.S. District Court's orders.

**5.10.** Even after the U.S. District Court issued its warning, <u>Rightside Group agreed to continue to thwart the U.S. District Court's orders</u> and, at the Baron group's request, continued freezing the domain names subject of the Court's order.

**5.11.** In addition to working with Rightside Group outside of court to thwart the Court's orders granting Katz authority, the Baron group also tried to undermine the District Court's order by seeking a TRO and injunction in Texas state court to prevent Katz from exercising authority and selling assets to pay off the entities' debts.  The Baron group also appealed from the U.S. District Court's orders.

**5.12.** The Baron group's motion for a temporary restraining order (originally filed in state court in Collin County Texas) was rejected by the U.S. District Court for the Eastern District of Texas, which transferred the Baron group's action to the Northern District.[8]

---

[7] *Id.* at 10.

[8] Doc. 12 in E.D. Tex. cause no. 4:14-cv-00255-DDB.

**5.13.** The Baron group's request for a restraining order was then denied by Hon. Judge Solis.[9]  The Baron group sought reconsideration by Hon. Judge Lindsay, and their 'Renewed Application for a Temporary Restraining Order' was again rejected.[10]

**5.14.** Hon. Judge Lindsay ordered that the injunctive relief sought by the Baron group in multiple cases and often in the name of the LLCs, was problematic because interference with Katz' authority as to the assets would directly undercut the court's receivership orders regarding the return of the assets to Katz.[11]

**5.15.** Thus, while the U.S. District Court ruled that the Baron group could proceed on their claims in the Collin County lawsuit, (asserting that Katz was replaced by McNair as manager for the LLCs), the Court rejected the Baron group's attempts to freeze the assets in the interim.

**5.16.** Moreover, the U.S. District Court ruled that if any actions by Baron or those acting on his behalf were taken to interfere with or undermine the Court's orders regarding the return of the LLCs' assets to Katz, then the parties involved should expect proceedings against them to follow.[12]

**5.17.** With the preceding warning, the Court remanded the Baron group's claims to the Collin County District Court.[13]  The claims were then adjudicated by the forum selected by Baron– the 401st District Court in Collin County, Texas.

**5.18.** Meanwhile, at the Baron group's request, Rightside was actively thwarting the U.S. District Court's orders to turn over control of the domain

---

[9] Doc. 16 in N.D. Tex. cause no. 3:14-cv-01552-P.

[10] Doc. 44 in N.D. Tex. cause no. 3:14-cv-01552-L.

[11] Doc. 71 in N.D. Tex. cause no. 3:14-cv-01552-L, at page 5 ("directly undercut the court's receivership orders regarding the return of the LLCs' assets to Katz").

[12] *Id.* ("interfere with or undermine the court's orders ... including the return of the LLCs' assets to Katz").

[13] *Id.* at page 1.

names to Katz.  Rightside Group rescinded Katz' control over the domain names and interfered with Katz' sale of domain names to Domain Vault LLC.

**5.19.**  The Baron Group's claims in the Collin County suit, including the claims (a) seeking an injunction to prevent Katz' sale of domain names and (b) seeking return of the domain names sold to Domain Vault LLC, were adjudicated against the Baron group.

**5.19.1.**  The Collin County District Court ruled that the claims were groundless, i.e., lacking even prima facie support.

**5.19.2.**  The Court ruled that Baron, et. al, take nothing by their claims and dismissed the claims with prejudice.

**5.19.3.**  No appeal was taken from the Collin County court's adjudication.

**5.20.**  The Baron group's appeals from the U.S. District Court's orders were rejected and dismissed by the Fifth Circuit.

**5.21.**  Finally, the Collin County District Court also separately adjudicated the issue of authority to represent Novo Point LLC and Quantec LLC.

**5.21.1.**  The Baron group claimed that David McNair and Paul Keating had authority over Novo Point LLC and Quantec LLC and sought to strike the LLCs' counsel, Christopher Payne, who was retained by Lisa Katz.

**5.21.2.**  The U.S. District Court had previously ruled on the matter, rejecting the Baron group's claim of McNair's authority and denying the motion to strike Payne as the LLCs' counsel.[14]

**5.21.3.**  The Fifth Circuit Court of Appeals had also ruled on the matter, denying the Baron group's motions on the merits.

---

[14] Doc. 1446 in N.D. Tex. cause 3:09-cv-00988-L,  at page 8, note 11.

**5.21.4.** Still, the Collin County District Court held a <u>full evidentiary hearing</u> and considered the testimony of David McNair and all evidentiary support offered by the Baron group.

**5.21.5.** After the multi-day evidentiary hearing, the Collin County District Court ruled against the Baron group, <u>struck the pleadings they had filed</u> in the name of the LLCs <u>and ordered the dismissal of their counsel</u>.[15]

**5.21.6.** The Baron group then sought reconsideration of the Collin County District Court's ruling, based on newly manufactured documents which purported to side-step the Court's ruling. The Court denied the Baron group's motion for reconsideration and no appeal was taken.

**5.22.** At that point there was no confusion about the courts' rulings. The court rulings are as follows:

**5.22.1.** The U.S. Federal District Court overruled the Baron group's challenge to Lisa Katz' authority and ordered the domain name assets turned over to Katz.[16]

**5.22.2.** The Baron group's challenge to Katz' authority, (and sale of domain names to Domain Vault LLC), was adjudicated against the Baron group by the Collin County District Court.[17]

**5.22.3.** The Collin County District Court found the Baron group's claims to be <u>groundless</u>, i.e., lacking even prima facie evidentiary support.[18]

---

[15] In the state court proceedings, the Baron group's scheme became fully exposed. It turned out that McNair was not independent or unrelated to Baron. Instead, he was Baron's long-time personal lawyer and the entire exercise was a complete sham.

[16] Feb. 28, 2014 Order in N.D. Tex cause 3:09-cv-00988-L (Doc. 1368) at page 9; and see Doc. 1395 in N.D. Tex cause 3:09-cv-00988-L at pages 9-10; and Doc. 71 in N.D. Tex. cause no. 3:14-cv-01552-L at page 5.

[17] Dec. 31, 2015 ORDER OF DISMISSAL WITH PREJUDICE in cause no. 401-01512-2014, 401st District Court, Collin County.

[18] *Id.*

**5.22.4.** The long list of claims made by Baron, et. al., were dismissed <u>with prejudice</u>.[19]

**5.22.5.** The Collin County District Court further found that the suit the Baron group brought *in the name of Novo Point LLC and Quantec LLC* was unauthorized,  struck their filings and ordered their counsel dismissed.[20]

**5.23.** From that point, there was not even a thread of defensibility for Rightside Group′s continued disregard for the U.S. District Court's order turning over control of the domain names to Katz' authority.

**5.24.** Intransigently, Rightside Group continued to participate in the Baron group's scheme to thwart the U.S. District Court′s order by directing name.com to maintain a freeze on the domain names, citing the Baron group′s challenge to Katz′ authority.

**5.25.** Thus, even after the Baron group's claims were adjudicated by the Collin County District Court and dismissed with prejudice,  <u>**Rightside Group is still thwarting the U.S. District Court's orders**</u> to turn control of the domain names over to Katz.

**5.25.1.** During the receivership wind-down, Rightside Group represented that it was locking the domain names until the court ruled in the Collin County case.

**5.25.2.** Then, after (1) the Baron group′s claims were adjudicated against Baron, et. al., and dismissed with prejudice, and (2) the Collin County District Court ordered the dismissal of the lawyers hired by the Baron group and struck the pleadings they had filed in the name the LLCs, for lack of authority to act in the name of the LLCs–  Rightside Group still refused to release their ′lock′ on

---

[19] *Id.*

[20] August 26, 2016 Order dismissing attorneys and striking pleadings, cause no. 401-01512-2014, 401st District Court, Collin County.

the grounds that <u>the Collin County case had not yet been **_administratively closed_**</u> <u>by the district clerk</u>.[21]

**5.25.3.**   Then, when the Collin County District Clerk administratively closed the case, Rightside Group <u>still</u> refused to remove its 'lock', now claiming that it had heard the Baron group might have litigation pending in a foreign country.

**5.25.4.**   As pleaded above, Rightside Group Ltd. <u>continues</u> to thwart the rulings of the U.S. District Court, and refuses to recognize the Court's orders granting Katz authority over the domain names.

**5.26.**   Rightside Group, moreover, supported its actions with a scheme of fraud and misrepresentation.

**5.26.1.** Part of that scheme involved Rightside Group's knowing misrepresentation as to the rights of domain registrants under the 'ICANN', (the Internet Corporation for Assigned Names and Numbers), rules and registrar agreements.

**5.26.1.1.** Rightside Group advertised its subsidiary name.com as an ICANN accredited registrar complying with the ICANN rules and procedure.

**5.26.1.2.** Under the ICANN rules, a registrar is authorized to lock a domain name when a cybersquatting dispute is filed against that domain by an alleged trademark holder seeking to enforce its trademark rights in the name.

**5.26.1.3.** Rightside Group engaged in a campaign of deception, seeking to pass off its participation in the Baron scheme to thwart the U.S. District Court's order granting Katz authority over the domain names as an authorized lock pursuant to contract and the ICANN rules.  It was not.

**5.26.1.4.** Rightside Group had actual knowledge that its lock of the domain names registered to Domain Vault LLC was not imposed pursuant

---

[21] Under Texas state law, the administrative status of a case has no legal effect or import.

the ICANN rules for pending 'UDRP' litigation, which is limited to cybersquatting disputes, i.e., involving trademark rights in a domain name.

**5.26.1.5.** Further, Rightside Group has actual knowledge that ICANN has a 'Uniform Domain Name Dispute Resolution Policy' which provides that even when domain names are locked, the registrar <u>must</u> allow transfer to new registrants if the party to whom the domain name registration is being transferred agrees to be bound by the decision of the court where a dispute as to a domain name is pending. Yet, Rightside Group instructed name.com to prevent transferring the domains to new registrants.

**5.26.1.6.** Likewise, Rightside Group had actual knowledge that the ICANN rules provide that each registrant <u>must</u> allow transfer of administration of any domain name to another registrar even during a pending court action as to the domain name, so long as the domain name will continue to be subject to such proceedings. Here again, in contravention and violation of the ICANN rules and uniform dispute resolution policy, Rightside Group instructed name.com to prevent transferring the administration for any of the domain names.

**5.26.2.** The other part of Rightside Group's scheme involved the fraudulent pretenses and representations, as pleaded above, section 8.5.4 below, and section 9.7.2 below, that Rightside Group would release the lock on the domain names when the Collin County District Court ruled in the case.

**5.27.** Rightside Group is disregarding the orders of the U.S. District Court <u>willfully</u>, with actual knowledge that it is violating the orders and instructions of the Court and its Receiver.

**5.27.1.** In or about February 2012, the Netsphere Receiver was concerned by Baron's threats to interfere with the transfer of domain names. To ensure that the names would stay under the control and jurisdiction of the U.S. District Court, the Receiver moved registration of domain names to a subsidiary of Rightside Group, name.com.

**5.27.2.** As pleaded above, in February 2014, the U.S. District Court ruled on and <u>rejected</u> the Baron group's attempt to appropriate control of the domain name assets.

**5.27.3.** On or about March 12, 2014, pursuant to the Court's orders, the Court's Receiver directed name.com **"to handover portfolio authority solely to Ms. Katz."** Further, the Receiver directed "Henceforward, we ask that you take direction from Ms. Katz" and to direct all "inquiries/information solely to Lisa Katz" (and her counsel).

**5.27.4.** Despite the clear directive from the Court's Receiver, Rightside Group began thwarting the orders of the U.S. District Court during the receivership wind-down.

**5.27.5.** Within **<u>seven</u>** business days of being informed of the rulings of the U.S. District Court and the instructions of the Court's Receiver, Rightside Group agreed with the Baron group to thwart the Court's orders and to countermand them. Rightside Group then thwarted the Court's orders, revoking Katz' authority and interfering with Katz' sale to Domain Vault LLC.

**5.27.6.** Then, as pleaded above and sections 8.5.4 and 9.7.2 below, Rightside Group engaged in wire fraud to delay enforcement action against it.

**5.27.7.** To this day, Rightside Group continues its refusal to recognize the U.S. District Court's orders and continues to interfere with Katz' sale of the domain names.

# COUNT I

## SUIT TO ENFORCE COURT ORDER

**6.1.** Without waiver of further proceedings under 18 U.S.C. 401 for contempt, Domain Vault LLC jointly and in the alternative pleads for an order (i) pursuant to 28 U.S.C. § 1651(a) directing Rightside Group Ltd. to comply with the orders of the U.S. District Court for the Northern District of Texas, and (ii) to enjoin Rightside Group Ltd. from further interference with the Court's orders with respect to the Netsphere Receivership assets.

**6.2.** The Court may issue an order to compel compliance with rulings of the U.S. District Court pursuant to 28 U.S.C. § 1651(a). The power conferred under section 1651(a) extends to persons who, though not parties to the original action, are in a position to "frustrate the implementation of a court order" or the proper administration of justice. *U.S. v. N.Y. Telephone Co.*, 434 U.S. 159, 174 (1977). Orders for relief pursuant to section 1651(a) are proper whether or not the party frustrating the implementation of a court order is themselves engaged in wrongdoing. *Id.*

**6.3.** Likewise, the Court may grant injunctive relief to compel compliance with prior court orders. The decision to grant injunctive relief is an act of equitable discretion by the district court. *eBay v. Mercexchange*, 547 U.S. 388, 391 (2006). An injunction is properly issued to enjoin violation of the law when there is a separate injury to a private interest. *See United States v. Dixon*, 509 U.S. 688, 695 (1993). The Fifth Circuit has recognized that violation of a court order is a violation of the law and has approved injunctions directing compliance with a court order because ordering a party to comply with the order of a court was simply ordering them to "obey the law". *US v. Love*, 431 F.3d 477, 482 n.20 (5th Cir. 2005).

**6.4.** According to well-established principles of equity, a plaintiff seeking an injunction must satisfy a four-factor test: A plaintiff must demonstrate: (1) irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by an injunction. *eBay*, 547 U.S. at 391.

**6.4.1.** If the current situation is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, or by the issuance of a mandatory injunction. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Harm is irreparable where there is no adequate remedy at law. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

**6.4.2.** The Fifth Circuit has recognized that a finding of irreparable harm is appropriate where economic rights are involved when the nature of those rights makes "establishment of the dollar value of the loss especially difficult or speculative". *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir. 1989).

**6.5. As pleaded above, Rightside Group has circumvented and continues to circumvent the orders of the U.S. District Court:**

**6.5.1.** In February, 2014, the U.S. District Court for the Northern District of Texas ordered that the receivership assets of Novo Point LLC and Quantec LLC be returned to Lisa Katz. Those assets included domain names registered at Rightside Group's subsidiary, name.com.

**6.5.2.** Soon afterwards, the Netsphere Receiver reported that Baron or persons acting on his behalf contacted and directed various portfolio managers, (such as Rightside), to disregard the Court's orders regarding the turnover of control of receivership assets to Ms. Katz.

**6.5.3.** In response, the Court issued an order that if such action happened, it would be a direct act to circumvent the Court's orders.[22]

**6.5.4.** Likewise, in denying the Baron group's motions to prevent Katz from selling the domain names, the U.S. District Court ruled that if those acting on Baron's behalf took action to interfere with the Court's orders regarding the award of control of the LLCs' assets to Katz, then the parties involved should expect to be found in contempt.[23] The Court ruled that freezing the domain names appeared to directly undercut the court's receivership orders regarding the return of the LLCs' assets to Katz.[24]

**6.5.5.** Having failed in court to interfere with Katz' authority over the assets, the Baron group sought to achieve their goal by recruiting Rightside Group to circumvent the court's orders. The Baron group asked Rightside Group to disregard the Court's orders that Katz have authority over the assets and to freeze the domain names Katz had sold.

**6.5.6.** Rightside Group agreed to participate in the Baron group's scheme.

**6.5.7.** Rightside Group then informed Domain Vault LLC that Katz' authority was in question and that the domain names were frozen pending a ruling on the Baron group's suit in the Collin County District Court.

---

[22] Pages 9-10 of Doc. 1395, cause 3:09-cv-00988-L.

[23] Page 5 of Doc. 71, N.D. Tex. cause 3:14-cv-01552-L.

[24] *Id.*

**6.5.8.**  Rightside Group was successful in inducing Domain Vault LLC to delay enforcement action and to wait for the ruling of the Collin County District Court.   As pleaded above:

**6.5.8.1.**  Domain Vault reasonably relied upon Rightside Group's representations that (i) the lock-down was pursuant to ICANN rules and (ii) that when the Collin County court ruled in the case, Rightside Group would release its lock on the domain names.

**6.5.8.2.**  Prior to the Collin County court's adjudication of the Baron group's claims, Right Group's fraudulent intent and collusion with the Baron group was undiscoverable.

**6.5.9.**  Then, the Collin County court ruled and found the claims of Baron, et. al., challenging the authority of Katz be groundless and dismissed the Baron group's claims with prejudice.   <u>But Rightside Group did not release the lock.</u>

 **6.5.10.**  When the Collin County District Court ruled against them, the Baron group engaged Rightside to disregard the Collin County court's ruling and to continue to thwart the U.S. District Court's orders granting Katz authority over the assets.  Rightside agreed to continue its participation in the Baron group's scheme.

**6.5.11.**   Thus, after the Baron group's claims challenging Katz' authority were dismissed with prejudice, Rightside willfully directed its subsidiary, name.com, to continue to disregard the U.S. District Court's orders.

**6.6. Actual and imminent injury that will be prevented by the Court's issuance of an injunction:**

**6.6.1.** <u>Rightside Group has refused to cease interfering with and undermining the U.S. District Court's order</u> granting Lisa Katz authority over the domain name assets.

**6.6.2.** As pleaded above, immediately after being ordered to transfer control of the assets to Katz, Rightside Group directed its subsidiary, name.com, to thwart the Court's orders and to undermine Katz' authority over the assets. Rightside Group then delayed enforcement action against it by engaging in wire fraud, as pleaded above, and as detailed in section 9.7.2 below.

**6.6.3.** Rightside Group has taken control of the domain names and is preventing Domain Vault from directing the domain names to active websites, and is locking Domain Vault out of operating a business at each of the domain names.

**6.6.3.1.** For example, Rightside has locked Domain Vault's domain name "Eritrea.com" to prevent Domain Vault LLC from pointing the domain name to a Domain Vault website for Eritrea tourism. Eritrea is located next to Ethiopia, and is the subject of more than a quarter of a billion web pages on the internet. That business, at the website "Eritrea.com" is projected to produce income of more than $3,000.00 per day.

**6.6.3.2.** Rightside has, instead, locked the domain name to point to a 'link farm' that sells link advertising with the income being deposited into the account of a Rightside Group subsidiary.

**6.6.3.3.** Every day that Domain Vault is prevented by Rightside Group from operating its websites, Domain Vault loses the income from each and every one of the websites for each of the domain names.

**6.6.3.4.** Rightside has locked more than a thousand domain names registered to Domain Vault LLC.

**6.6.3.5.** Every day that Rightside Group locks Domain Vault LLC out of business for each website, Domain Vault loses the building of good will, the

establishment of a loyal customer base, and loses all of the other intangible benefits that are incident to operating an ongoing business.

**6.6.3.6.** Rightside has put Domain Vault LLC out of business on each and every website at more than a thousand domain names that Rightside Group has locked.  Every day that Rightside's action continues, further and greater losses are being caused to Domain Vault LLC.

**6.6.4.** Further, because the domain names are not directed to operational website businesses, Rightside Group is encouraging the filing of UDRP complaints seeking to take over the domain names.

**6.6.4.1.** One element that defeats a UDRP claim is that the domain name is being used by a legitimate website.

**6.6.4.2.** Thus, by preventing Domain Vault LLC from operating websites for the domain names, Rightside Group is causing Domain Vault to incur substantial costs in defending UDRP complaints, and in recovering domain names lost to UDRP proceedings.

**6.6.5.** Also, Domain Vault LLC continuously receives offers seeking to purchase different domain names locked by Rightside Group. Rightside Group is preventing Domain Vault from consummating sales of domain names by preventing the change in the name of the registrant and transfer to another registrar.

**6.6.6.** By locking the domain names, Rightside is preventing Domain Vault LLC from transferring registration of names to any purchasers  Domain Vault thereby is suffering continuing loss from lost sales.

**6.6.7.** Notably, in thwarting the U.S. District Court's orders, Rightside Group's interference with transfer of the domain names to new registrants is also in defiance of and in direct violation of the ICANN rules.

**6.7. The remedies available at law, such as monetary damages, are inadequate to compensate for the injury being suffered by Domain Vault LLC and the injury is therefore irreparable:**

**6.7.1.** The establishment of the dollar value of the loss incurred by Domain Vault LLC is especially difficult and speculative. Projecting the lost income for websites is inherently speculative.

**6.7.1.1.** Thus, for example, Domain Vault can show likely income of $3,000 per day with Eritrea.com. However, Domain Vault LLC can only prove a fraction of that amount with reasonable <u>certainty</u>.

**6.7.1.2.** Pursuant to law, Domain Vault LLC can only recover as damages that loss income which can be established with reasonable certainty.

**6.7.1.3.** Thus, $2,900.00 of Domain Vault LLC's $3,000 per day loss on the Eritrea.com domain name cannot be recovered because the loss can be proven only with likelihood, not with reasonable certainty.

**6.7.1.4.** This same problem exists for every one of the domain names that Rightside Group has taken control over– establishment of the dollar value of the daily loss is especially difficult or speculative and therefore money damages available at law are inadequate to compensate for the loss and that loss will therefore be irreparable.

**6.7.1.5.** Likewise, Rightside's takeover of the domain names registered to Domain Vault LLC is causing other, related irreparable damages such as

the loss of business good will, the establishment of reputation and a loyal customer base. An amount of damages cannot be proven with reasonable certainty for these losses, and the losses are therefore irreparable.

**6.7.2.** Also, while Domain Vault LLC can prove that Rightside Group's control over the domain names registered to Domain Vault are substantially more likely to be targeted by UDRP claims, Domain Vault cannot generally prove that any particular UDRP claim would not have been filed but for the Rightside Group's actions. Accordingly, the damages incurred by the filing of UDRP claims cannot be recovered through damages and are therefore irreparable.

**6.7.3.** Further, so long as Rightside Group retains control over the domain names registered to Domain Vault LLC, Domain Vault cannot list any domains for sale on the domain's website, or transfer control of domains to purchasers.

**6.7.3.1.** Because Rightside is preventing the advertisement of domain names as being for sale on the website where prospective purchasers could see the advertisement, no such advertisement exists and it is unknowable which sales have been lost. The losses are therefore irreparable.

**6.7.3.2.** Likewise, because Rightside Group is preventing the transfer of registration of the domain names, Domain Vault cannot list for sale any domain names for immediate use by purchasers. Since the names cannot be, and therefore are not listed for immediate use, it is unknown what sales have been lost, and the losses are therefore irreparable.

**6.7.4.** Finally, in light of the large number of websites locked by Rightside, the accumulation of daily losses that can be established with reasonable certainty are outpacing Rightside's ability to compensate for them.

**6.7.4.1.** If Rightside continues to lock the domain names, because the rate at which damages are accumulating, the loss caused to Domain Vault LLC will soon exceed the total assets of Rightside.

**6.7.4.2.** Even as Domain Vault can only recover for a small portion of the actual damages incurred, that small portion is significant. The average daily loss of as little as $100 per day per website, involves more than $108,000.00 in total <u>daily loss</u> for 1,080 websites.

**6.7.4.3.** Because of the large scale upon which Rightside Group has acted to injure Domain Vault LLC, Rightside does not have sufficient assets, including insurance, to pay the total damages that are reasonably certain to occur by the time the case is adjudicated, and the damages are therefore irreparable.

**6.8. Injunction is warranted considering the balance of hardships between Domain Vault LLC and Rightside Group:**

**6.8.1.** Domain Vault LLC is placed at substantial hardship by Rightside Group's continued locking of the domain names.

**6.8.1.1.** As pleaded above, <u>Rightside has put Domain Vault out of business at over a thousand locations.</u>

**6.8.1.2.** Each day that passes, Domain Vault suffers more the $108,000.00 in further daily losses provable with reasonable certainty plus more losses that cannot be remedied at law because they cannot be proved with reasonable certainty.

**6.8.2.** On the other hand, <u>Rightside Group suffers no hardship or loss by ceasing to act to thwart the Court's orders</u>.

**6.8.2.1.** Rightside Group has no economic interest in the domain names and does not claim any ownership interest in them.

**6.8.2.2.** Rightside Group's subsidiary, name.com is just a registrar for the domain names. The registrar's function is merely to make the 'WHOIS' and "DNS" records for each domain name available on the internet.

**6.8.2.3.** Outside of any unlawful arrangement made with the Baron group, Rightside Group will suffer no economic loss by ceasing to interfere with the domain names registered to Domain Vault.

**6.8.2.4.** Only the improper private interest of officers or employees of Rightside Group are at stake in Rightside's refusal to cease interfering with the Court's order that Lisa Katz have authority over the domain names.

**6.8.2.5.** If ordered to immediately release the lock it imposed on the domain names registered to Domain Vault LLC, Rightside Group is placed at no hardship.

**6.8.3.** In fact, the entry of an injunction is in Rightside Group's economic interest.

**6.8.3.1.** The entry of an injunction will eliminate Rightside Group's liability for future damages, at no cost or loss to Rightside Group.

**6.8.3.2.** It is in Rightside Group Ltd.'s clear economic interest for the Court to order it to immediately release the lock it imposed on the domain names registered to Domain Vault LLC. Rightside thereby eliminates substantial risk of loss for the future damages it is causing and incurs no loss or cost for doing so.

**6.8.3.3.** The reason Rightside Group has not done so itself is because it is participating in the Baron group's scheme to undermine, and thwart the

Court's order granting authority to Lisa Katz over the domain names and to interfere with Katz' sale of the domain names to Domain Vault LLC.

**6.9.  The public interest will be served by an injunction against Rightside Group:**

**6.9.1.** Rightside Group is causing damage beyond the losses directed at Domain Vault.

**6.9.1.1.** For example, in the case of Eritrea.com, pleaded above, Rightside Group is preventing the operation of a website that would help promote economic development and tourism for the country of Eritrea, the only African country to have no privately owned news media.

**6.9.1.2.** Likewise, Rightside Group is preventing the operation of sites with a significant public health impact, such as the research support website "cellbiology.com" and dozens of others.

**6.9.1.3.** The economic hardships of Rightside Group's actions are substantial.  In shutting down over a thousand website businesses, Rightside Group is preventing  hundreds of people from working at those businesses.

**6.9.2.** The Baron group is engaged in a campaign seeking to delegitimize the courts and the court system.

**6.9.2.1.** The Baron group, (and confederates), have filed multiple ethical complaints against judges in multiple jurisdictions as well as repeatedly filing lawsuits against judges seeking to delegitimize the courts.

**6.9.2.2.** Likewise, the Baron group has published numerous internet articles attacking judges and the courts as corrupt and lawless.

**6.9.2.3.** Simultaneously, the Baron group has sought to undermine and thwart the orders of the courts by inducing other's disobedience of the

courts' orders and by publishing material misrepresentations about the courts' rulings.

**6.9.3.** To a large extent, <u>to this point Rightside Group and the Baron group have gotten away with their defiance of the courts</u>.

**6.9.4.** Rightside Group has acted with willful disregard and contempt for the rulings of the U.S. District Court for the Northern District of Texas and the express instructions of the Court's Receiver.  As pleaded above:

**6.9.4.1.** The U.S. District Court ruled on and rejected the Baron group's challenge to Lisa Katz' authority and issued an order that the assets of Novo Point LLC and Quantec LLC, which included domain names controlled by Rightside Group, be placed in Katz' control.

**6.9.4.2.** When the Receiver informed the Court that Baron was soliciting the portfolio managers to disregard the Court's order, the Court ruled that attempts to interfere with Katz' control or to otherwise thwart the Court's order would constitute contempt of the Court's orders.

**6.9.4.3.** Yet, Rightside Group proceeded to disregard the receiver's instructions and the U.S. District Court's orders and, in an effort to thwart those orders, froze the domain names that Katz transferred to Domain Vault LLC, on the grounds that Katz' authority was being questioned.

**6.9.4.4.** Rightside Group represented that it would cease its interference with the domain names when the Collin County District Court ruled on a suit filed by the Baron group in Collin County, Texas, challenging Katz' authority.  Then, when the Collin County District Court adjudicated and rejected the Baron group's claims challenging Katz' authority, Rightside Group ignored the state court's rulings and continued to participate in the

Baron group's scheme to thwart the U.S. District Court's order granting Katz authority over the domain names.

**6.9.5.** Rightside Group joined the Baron group's war against the legal system and has provided, and continues to provide the participation and support necessary to thwart the orders issued by the U.S. District Court. <u>Rightside Group continues, unabated, to willfully thwart the orders issued by the U.S. District Court</u>.

**6.9.6.** Private parties need to respect court orders.  That is the cornerstone of the rule of law.  Rightside Group should not be above the Court's power.

**6.9.7.** The public interest would be served by an order directing Rightside Group to cease all actions thwarting the court's orders and directing that Rightside immediately release the freeze that it placed on the domain names sold by Lisa Katz, who was ordered pursuant to the ruling of the U.S. District Court to be given control over the domain name assets.

## COUNT II

## INTERFERENCE WITH CONTRACT

**7.1.** Pursuant to Texas law, a party may recover for tortious interference with a contract based on four elements: (1) a contract; (2) intentional interference; (3) proximate causation of (4) actual damage or loss. *E.g., Seelbach v. Clubb*, 7 S.W.3d 749, 756 (Tex.App.-Texarkana 1999, pet. denied). Interference which delays the transaction or makes performance of less value qualifies as interference under the law. *Hughes v. Houston Northwest Medical Center, Inc.*, 680 S.W.2d 838 (Tex.Civ.App.—Houston [1st Dist] 1984, writ ref'd n.r.e.). Exemplary damages are recoverable in addition to actual damages when a plaintiff shows the interference was malicious. *Seelbach*, 7 S.W.3d at 757.

**7.2. A contract**:

**7.2.1.** When the U.S. District Court released the assets of Novo Point LLC and Quantec LLC from the Receiver in the Netsphere case, Lisa Katz, (authorized by the US Federal District Court with authority over the assets and as the operations manager of Novo Point LLC and Quantec LLC), undertook to start making payments on the substantial debt accumulated by the companies.

**7.2.2.** To that end, in March, 2014, Katz sold domain names to Domain Vault LLC, ('Domain Vault').

**7.2.3.** Katz transferred title of the assets to Domain Vault and undertook the obligation to register the assets in the name of Domain Vault and, further, to take all steps necessary to vest Domain Vault with full physical control over the assets.

**7.3. Intentional interference**:

**7.3.1.** Rightside had knowledge of  Katz′ agreement to transfer the domain names to Domain Vault LLC, and was specifically informed of the agreement, and acted with the intent to interfere with the agreement.

**7.3.2.** Rightside directed its subsidiary, name.com to freeze all actions undertaken by name.com in carrying out the directions of Katz in furtherance of the agreement, and Rightside directed name.com to freeze the domain names of Domain Vault LLC.

**7.3.3.**  Rightside′s actions were taken in coordination with and at the request of the Baron group.   The Baron group requested Rightside to step in and interfere with Katz′ agreement to sell the names.

**7.3.4.**  Rightside interfered with control over the domain names that Katz contracted to sell to Domain Vault, in an intentional effort to interfere with Katz' sale of the domain names.

**7.3.5.**  Rightside admitted that the domain names were frozen at the request of the Baron group to interfere with Katz' sale.  Further, Rightside informed name.com that the reason the freeze was imposed was because Katz′ authority was being questioned by the Baron group and, therefore, Katz′ transfer of domain names to Domain Vault LLC was frozen by Rightside.

**7.3.6.** Domain Vault reasonably relied upon the Rightside Group's representations that it would release the lock on the domain names when the Collin County District Court ruled in the case.

**7.3.6.1.**  During the pendency of the Collin County lawsuit Domain Vault had no means of knowing that Rightside was cooperating with the Baron group and its reference to the Collin County lawsuit was just a pretense.

**7.3.6.2.**  Rightside′s participation in the Baron group′s scheme, private communications with the Baron group, secret disclosures to the Baron group of insider information about the domain names, etc., was still undiscovered by Domain Vault.

**7.3.6.3.**  The U.S. District Court had remanded the Baron group′s claims to the Collin County District Court and Rightside represented that it was freezing the assets until the ruling of the Collin County Court.

**7.3.6.4.**  In that circumstance, while the arrangements between Rightside and the Baron group were still hidden, there was a plausible basis for Rightside′s actions to have been without malice.

**7.3.6.5.**  Rightside′s malice was, to that point, undiscoverable.

**7.3.7.**  Once the Collin County District Court ruled against the Baron group,  found the Baron group′s claims to be groundless, ordered that Baron, et. al. take nothing on the claims,  and dismissed the claims with prejudice– there was no longer any good faith basis, however misguided, for Rightside′s continued interference with Katz′ sale of domain names to Domain Vault LLC.

**7.3.8.**  At that time, Rightside was ′unmasked′ and their intentional participation in the Baron group′s scheme was exposed by Rightside′s malicious maintenance of the lock on the domain names after the final

adjudication of the Baron group′s claims by the Collin County District Court.

**7.3.9.** Rightside Group, thus, maliciously interfered with Katz' sale of the domain names by directing its subsidiary to maintain a lock on the domain names, after Rightside knew that the Collin County District Court adjudicated and dismissed the Baron group's claims with prejudice.

**7.3.10.** In or about November, 2016 it came to light that Rightside had been in secret contact with the Baron group and was forwarding insider information about the domain names owned by Domain Vault LLC to the Baron group.

**7.4. Proximate causation of actual damages:**

**7.4.1.** The actions of Rightside to interfere with Katz′ contract to assign domain names to Domain Vault LLC was the proximate cause of actual damages and loss to Domain Vault LLC, as pleaded above:

**7.4.2.** By locking and taking control of the 'DNS' records for the domain names registered to Domain Vault LLC, Rightside prevented Domain Vault from operating the domain names as active websites.

**7.4.2.1.** While Domain Vault cannot be certain of the full extent of damages caused from the delay in using the domain names for active websites, a minimum amount can be established with reasonable certainty based on the income of websites similar to those frozen by Rightside.

**7.4.2.2.** Rightside froze over 1,080 domain names that could have otherwise been operated by Domain Vault as active website businesses.

**7.4.2.3.** Average daily income for those businesses, with reasonable certainty would have exceeded $100.00 per site.

**7.4.2.4.** Rightside froze Domain Vault LLC's development of those sites for almost two years with proximate damages exceeding $72 Million dollars in lost profits as of the date of filing this complaint.

**7.4.2.5.** Daily loss will in reasonable certainty continue to accrue after the filing of this suit, at the rate of over $108,000.00 per day, every day Rightside's lock on the domain names continues.

**7.4.3.** By locking the domain names, Rightside delayed completion of Katz' agreed to obligations and during that delay prevented Domain Vault LLC from changing the registrant of the names to another party or from transferring the domain names to another party.   Accordingly, Domain Vault was unable to complete over $1.2 Million in domain sales despite having firm, written offers which were lost due to Rightside's interference.

**7.4.4.**   Rightside locked the 'DNS' records for the domain names so that the domain names pointed to 'monetization' sites over which Domain Vault did not have control, and through which substantial income was generated by the domain names registered to Domain Vault LLC but the income went to the bank accounts of Rightside Group or its subsidiary. Upon information and belief, the loss caused to Domain Vault LLC, exceeds $1 Million Dollars.

**7.4.5.** Because Domain Vault could not control the websites attached to its domain names (Rightside controlled those), the names were subject to 'cybersquatting' claims.   As a result, Domain Vault suffered substantial

reputation damage and other loss including attorney's fees for defending 'UDRP' cybersquatting claims.

**7.4.6.** Because Rightside prevented Domain Vault LLC from selling the names to another party or transferring the names to another registrar, by delaying Domain Vault LLC's full control over the domain names, Rightside also caused Domain Vault to pay to Rightside registration fees totaling in excess of $80,000.00.

**7.4.7.** According to Rightside's co-conspirators, the value of the domain names when the Collin County district court adjudicated the Baron group's claims exceeded $60 Million Dollars.  The liquidation value of the domain names today is believed to be less than $10 Million.   Accordingly, based on the valuation acknowledged by Rightside's co-actors, Domain Vault suffered direct, proximate and actual loss of over $50 Million Dollars in the decreased value of the domain names due to the delay imposed by Rightside.

**7.5. Rightside is also liable for exemplary damages:**

**7.5.1.** As pleaded above, Rightside acted with *malice* when it directed name.com to continue to freeze the domain names of Domain Vault LLC after the Collin County District Court adjudicated the Baron group's claims and ruled the claims were groundless.

**7.5.2.** Moreover, Rightside acted with the specific intent to cause substantial harm to Domain Vault by keeping the 'DNS' records of Domain Vault's domain names locked.

**7.5.2.1.** After the Collin County District Court adjudicated the Baron group's claims, there was no defensible basis for Rightside to lock the DNS records.

**7.5.2.2.** The DNS records control to which website the domain name 'resolves'-- which website someone sees when they type the domain name in a 'browser' or press a link to the domain name.

**7.5.2.3.** By locking the DNS server records, Rightside Group prevented Domain Vault from controlling or operating the websites for each of the domain names.

**7.5.2.4.** There is no plausible reason Rightside Group would have for locking the DNS records after the court ruled on the Baron group's claims, other than a specific intent to cause substantial harm to Domain Vault LLC.

**7.5.2.5.** Rightside Group was successful in causing substantial harm.  As detailed above, because of the scale of its action in locking the DNS records of over a thousand domain names, Rightside Group caused millions of dollars in actual damages to Domain Vault LLC.

## COUNT III

## CIVIL CONSPIRACY

**8.1.** Domain Vault LLC pleads jointly a claim for state law civil conspiracy.

**8.2.** Pursuant to Texas law, to establish a claim for civil conspiracy, a plaintiff must prove (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or on a course of action; (4) one or more unlawful, overt acts by one of the conspirators; and (5) damages as the proximate result. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996).

**8.2.1.** Interference with business operations and interference with contract are both unlawful objectives that support recovery for civil conspiracy. *Berry v. Golden Light Coffee Company*, 327 S.W.2d 436, 440 (Tex. 1959)(interference with business); *Raymond v. Yarrington*, 96 Tex. 443, 73 SW 800, 803 (1903)(interference with contract).

**8.2.2.** A civil conspiracy may be proved by inference and circumstantial evidence. *Jernigan v. Wainer*, 12 Tex. 189, 193 (1854).

**8.3. Two or more persons and an object to be accomplished**:

**8.3.1.** As pleaded above, the Baron group requested that Rightside Group assist in thwarting the U.S. District Court's order authorizing Lisa Katz to take control over domain names registered at Rightside's subsidiary, name.com. The Baron group's objective was to thwart the U.S. District Court's order by interfering with Katz' exercise of control over the assets of Novo Point LLC and Quantec LLC. Rightside and the Baron group's members conspired together to attempt to prevent Katz from selling the assets and, upon displacing Katz, to take over the assets of Novo Point LLC and Quantec LLC including the domain names registered at name.com.

**8.3.2.**  Rightside Group participated in joining the Baron group's scheme at the request of Baron group member Paul Keating.  Keating further requested that Rightside Group secretly provide the Baron group insider information about the domain names registered to Domain Vault LLC, including, for example, being notified by Rightside Group if a UDRP domain name dispute were filed against any of the names registered to Domain Vault LLC.

**8.3.3.** Rightside Group agreed to freeze the domain names registered to Domain Vault LLC, and agreed to provide Keating with insider information about the domain names, including notice of any upcoming UDRP actions. Rightside Group carried out its agreement with the Baron group.

**8.3.4.** The scheme was based on the Baron group's objective of interfering with Katz' sale of domain names to Domain Vault LLC and thereby thwarting the U.S. District Court's orders granting Katz authority over the assets.

**8.3.5.** The objectives of the Baron group, as pleaded above, constitute (i) an unlawful interference with contract and (ii) an unlawful violation and contempt of the orders of the U.S. Federal court.

**8.3.6.** Rightside Group had actual knowledge that the Baron group's requests to Rightside to interfere with the Court's orders and Katz' authority over the domain names were unlawful and in violation of the orders of the U.S. District Court, because, inter alia, the U.S. District Court entered an explicit order stating so.

**8.4. Meeting of minds on the object or on a course of action**:

**8.4.1.** As pleaded infra and supra, Rightside Group agreed to participate in the Baron group's scheme and to interfere with Katz' authority over and sale of domain names.  Rightside Group agreed to act upon the requests of the Baron

group and then acted upon those requests to freeze the domain names and to refuse to unlock the domain names even after the Collin County District Court dismissed the Baron group's claims with prejudice.

**8.5. One or more unlawful, overt acts by one of the conspirators**:

**8.5.1.** The Baron group used groundless claims filed against Domain Vault LLC and others to provide cover for the freeze of the domain names. The filing of the claims by the Baron group constituted tortious abuse of process. The Baron group knew its claims were groundless and vexatiously filed its claims in order to provide the appearance of legitimacy for Rightside Group's freezing of the domain names.

**8.5.2.** In furtherance of the scheme Rightside Group directed its subsidiary to interfere with the sale of domain names to Domain Vault LLC by maintaining a freeze on the domain names registered to Domain Vault LLC.

**8.5.3.** Rightside Group directed its subsidiary to maintain the freeze on the domain names even though Rightside Group had actual knowledge of the adjudication of the claims against the Baron group and dismissal of the claims with prejudice by the Collin County District Court.

**8.5.4.** In furtherance of the scheme Rightside Group also engaged in fraud.

**8.5.4.1.** For example, on or about December 5, 2016, Ryan Nichols emailed to Dallas Texas emails representing that the reason the domain names registered to Domain Vault LLC were frozen was because that the litigation in Collin County was still open and as such, Rightside was not in a position to remove its "pending litigation lock". Nichols represented that when the Collin County case was closed the lock would be released. The representations were false and known to be false by Rightside Group. The

domain names registered to Domain Vault LLC were frozen because of Rightside's participation in the Baron group's scheme and Rightside would not release the names regardless of the outcome or 'closing' of the Collin County suit.

**8.5.4.2.** From 2015 to the end of 2016, in emails sent to Dallas Texas by employees or officers of Rightside Group, Rightside repeatedly, overtly and aggressively fraudulently represented that the lock on the domain names registered to Domain Vault LLC was "in place pursuant to the following litigation: Novo Point and Quantec v. Katz, et al., Court Filed: District Court of Collin County, Texas, Case No.: 401-01512-2014" and would be removed at the end of the litigation.

**8.5.4.3.** Rightside's representations were false and known to be false and were made with the intent and purpose that Domain Vault LLC rely upon the representations in order to delay Domain Vault LLC from taking enforcement action.

## 8.6. Proximately resulting damages:

**8.6.1.** The damages caused to Domain Vault LLC proximately resulted from the conspiracy and actions taken in furtherance thereof, as pleaded in sections 3., 5., and 7.4 above, and section 9.8 below.

## 8.7. Malice supporting exemplary damages:

**8.7.1.** Rightside Group committed to participate in the Baron group scheme to undermine the courts' orders and to freeze the domain names and agreed to continue to do so unless Rightside was forced to cease interference with Katz' sale to Domain Vault LLC by court order.

**8.7.2.** Accordingly, Rightside Group acted in its conspiracy with the Baron

group with <u>actual malice</u> and the intent to cause continuing damage to Domain Vault LLC <u>for as long as possible</u>.

**8.8. Additional claim for Acting in Concert:**

**8.8.1.** Texas law may recognize claims for Acting in Concert as delineated by the Restatement, 2nd, of Torts §876(a) and (b), and for which claims Domain Vault LLC also jointly pleads. A claim for Acting in Concert is established when the defendant: (A) (i) engages in a tortious act (ii) in concert with the other or pursuant to a common design with him, or (B) (i) knows that the other's conduct constitutes a violation of the other's duty and (ii) gives substantial assistance to the other to commit the tort. *Juhl v. Airington*, 936 S.W.2d at 64

**8.8.2.** <u>Tortious act:</u>

**8.8.2.1.** As pleaded above, Rightside both tortiously interfered with Katz' sale of the domain names and engaged in fraud pursuant to the Baron group's scheme to freeze the names.

**8.8.3.** <u>In concert:</u>

**8.8.3.1.** As pleaded in this complaint, Rightside Group acted in concert with, in communication with, and at the direction of the Baron group and the group's Paul Keating in taking its actions.

**8.8.4.** <u>Knowledge of Baron group's violation of duty:</u>

**8.8.4.1.** Rightside had actual knowledge of the orders and rulings of the U.S. District Court for the Northern District of Texas and the adjudication of the claims in the Collin County District Court.

**8.8.4.2.** Rightside Group had actual knowledge that the U.S. District Judge ordered that Katz have authority and ordered that the domain name assets be placed under Katz authority.

**8.8.4.3.** Further Rightside had actual knowledge that the Collin County District Court ruled that the Baron group's claims were groundless, lacking even *prima facie* evidence in support.

**8.8.4.4.** Rightside had been informed of the activities of the Baron group and had actual knowledge that the Baron group's scheme to thwart the U.S. District Court's order granting authority to Lisa Katz was in contempt of the Court's order and unlawful.

**8.8.4.5.** Rightside Group had actual knowledge that Lisa Katz was authorized pursuant to U.S. District Court's order and Rightside intentionally acted at the request of the Baron group to undermine the Court's order and to interfere with Katz' sale of domain names to Domain Vault LLC.

**8.8.5.** <u>Substantial assistance:</u>

**8.8.5.1.** Rightside Group actively participated in the Baron group's scheme and gave substantial assistance by freezing the domain names registered to Domain Vault LLC in order to tortiously interfere with the sale of domain names to Domain Vault.

**8.8.5.2.** Since the Baron group's legal proceedings were resolved against the Baron group– and the Baron group's motions for TRO and injunction to prevent Katz' sale of the domain names were denied and overruled, the Baron group's only remaining option to thwart the Courts' orders and to interfere with Katz' sale of domain names was the participation of Rightside Group.  Rightside Group's participation was critical to the success of the Baron group's scheme to interfere with the sale of names to Domain Vault LLC.

## COUNT IV

## CIVIL RICO

**9.1.** Pursuant to 18 U.S.C. § 1964 (c), any person injured in his business or property by reason of a violation of section 1962 of that chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys fee. In turn, Section 1962 (c) prohibits (i) any person employed by or associated with any (ii) enterprise (iii) engaged in, or the activities of which affect, interstate or foreign commerce, (iv) to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through (v) a pattern of racketeering activity. Subsection (d) of section 1962 prohibits any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of the section.

**9.2.** Pursuant to 18 U.S.C. § 1961 "racketeering activity" includes, inter alia, any act involving dealing in obscene matter which is chargeable under state law, extortion, or an act in violation of 18 U.S.C. § 1343 (relating to wire fraud). In turn, Section 1343 forbids intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses or promises, in which the defendant transmits or causes to be transmitted by means of wire in interstate or foreign commerce, any writings or signals for the purpose of executing such scheme or artifice.

**9.3. The existence of an enterprise**:

**9.3.1.** An enterprise includes any group of individuals associated in fact and reaches a group of persons associated together for a common purpose of engaging in a course of conduct. An association-in-fact enterprise must have at least three structural features: (i) a purpose, (ii) relationships among those

associated with the enterprise, and (iii) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. US*, 129 S.Ct. 2237, 2244 (2009).

**9.3.2.**   The association and its purpose.

**9.3.2.1.**   Jeff Baron, David McNair, Paul Keating, ("the Associates"), associated together for the common purpose of engaging in a course of conduct to thwart the U.S. District Court's orders recognizing Katz' authority over Novo Point LLC and Quantec LLC.  In support of that end, a common purpose of the association was to interfere with Katz' sale of domain names to Domain Vault LLC.

**9.3.2.2.**   In carrying out the affairs of the group, the associates acted together and through and in the name of various sham 'front' entities controlled by them, or which they purported to control, (the "Baron group").

**9.3.2.3.**   The ultimate purpose of Baron, McNair and Keating's association was to facilitate Baron's attempt to appropriate the assets of the Village Trust.  Baron originally funded the trust with one Dollar and the trust was set up as a legitimate, independent trust. The terms of the trust provided that it be controlled by an independent Trustee who was prohibited from being related to, or subordinate to Baron.  The trust was operated by an independent trustee for the benefit of a non-profit foundation for researching a cure to childhood diabetes.   In settlement of a suit against Baron for misappropriation of over half a million domain names, (which Baron had been alleged to have converted by having a domain name registrar take control of the domain names), over a hundred thousands domain names were transferred to Novo Point LLC and Quantec LLC,

entities owned by the trust.  After the settlement, Baron and his confederates attempted to illicitly gain control over the trust and to appropriate the domain name assets of Novo Point LLC and Quantec LLC.

**9.3.3.**  The relationships among those associated with the enterprise:

**9.3.3.1.**  Pursuant to the rulings of the Supreme Court, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. *Boyle* at 224.

**9.3.3.2.**  Baron, McNair, and Keating acted as a continuing unit functioning for their common purpose, as pleaded above.  Their association as a unit began at least as early as February 2014, and continues to this day.

**9.3.3.3.**  Functionally, Baron is the boss and directs the activities of McNair and Keating.

**9.3.3.4.**  McNair acts as the front man for the enterprise and operates the shell organizations used by the Baron group as 'front entities' in the course of their activities.  McNair usually plays the role of 'Director' of the various sham entities used by the enterprise.

**9.3.3.5.**  Keating plans and manages 'back end' operations such as soliciting third parties to participate in the enterprise.  Generally, in pursuing the objectives of the enterprise, Keating represents that he is counsel for one of McNair's sham entities, or even as counsel for Novo Point LLC and Quantec LLC.  Keating has on occasion, in seeking to pursue the objectives of the enterprise, even represented that he was counsel for Domain Vault LLC.

**9.3.3.6.**  Keating acts in coordination with Baron and McNair to direct the vexatious legal actions which are an operative and continuing tool of the enterprise. Such actions were filed by the enterprise in jurisdictions including Australia, the U.S. Federal District for the Southern District of Florida, Collin County District Court, Bankruptcy Court for the Northern District of Texas, and Bankruptcy Court in the Eastern District of Texas. The enterprise's vexatious suits have been filed in 2014, 2015, and 2016.

**9.3.3.7.**  At Baron's direction Keating solicits legal counsel to participate in the enterprise's activities through the filing of groundless and vexatious actions, with McNair, (or a shell entity that he controls or purports to control), typically acting as the front man.

**9.3.3.8.**  It is an ongoing course of conduct for the enterprise to conduct vexatious litigation and leave its own counsel, (generally solicited by Keating), with substantial unpaid fees.  The vexatious litigation filings are part of the continuing purpose of the enterprise, with the apparent hope that some court would recognize McNair or a McNair shell entity as the manager of Novo Point LLC and Quantec LLC in order to interfere with Katz' control over the assets and enable the enterprise to funnel the assets to Baron. Such tactics are a hallmark of Baron, who has been declared a vexatious litigant by the U.S. District Court for the Northern District of Texas.

**9.3.3.9.**  Keating, Baron and McNair coordinate their activities and act together as a unit to carry their common purpose as detailed above.

**9.3.4.** Longevity:

**9.3.4.1.** Pursuant to the rulings of the Supreme Court, the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct. *Boyle* at 224

**9.3.4.2.** As pleaded above, the association of Keating, Baron and McNair started at least by February 2014 and has continued to this day with the same relationships among those associated in the enterprise.

**9.3.4.3.** As pleaded above, Baron, Keating & McNair organized the enterprise in an effort to interfere with the court order authorizing Katz' management of Novo Point LLC and Quantec LLC in an effort to appropriate assets released from the receivership in the *Netsphere* case.

**9.3.4.4.** The organization has been ongoing since that date with the same superstructure, as pleaded above, for making and carrying out decisions. From 2014 and continuing through 2017, the enterprise has continued to function as a continuing unit as pleaded above. Thus, for example, in 2014 the enterprise sought the participation of Rightside Group to thwart the orders of the U.S. District Court and prevent Katz from exercising authority over the domain names and selling domain names to Domain Vault LLC.

**9.3.4.5.** The enterprise requested Rightside Group participate in the activity and freeze the domain names registered to Domain Vault LLC. The enterprise continued in existence with the same relationships among those associated, and pursued the same course of conduct, make independent requests for Rightside Group's participation in 2014, 2015, 2016 and 2017.

The enterprise sought the cooperation and participation of Rightside Group, and others, in each of those years.

**9.3.4.6.** Upon information, the enterprise has used numerous shell entities including throughout the years 2014 through 2017. These entities include, but are not limited to "CITP Ltd.", "RVP Limited", and "Associated Recovery, LLC".

**9.3.4.7.** Through these entities, in pursuit of the above pleaded purposes, the association has filed multiple frivolous lawsuits and fictitious claims against: Lisa Katz, Christopher Payne (counsel for Novo Point LLC and Quantec LLC), the Ondova Bankruptcy Trustee, the U.S. Federal Receiver in the Netsphere case, the U.S. Marshals, State Farm Mutual Automobile Insurance Company, Domain Vault LLC, Godaddy.Com, LLC, True Magic, LLC, Merlin Kauffman, Power Home Technologies, LLC, Fujifilm North American Corporation, Linda Butcher, CBRE Group, Inc., Timy Lee, Vivian Rosenthal, William Wolfson, Priveco, Inc., Steve Parma, Tumult, Inc., Toby Clements, Luigi Marruso, Jaano, LLC, Lookout, Inc, Alberto Escarlate, Adam Strong, News, Ltd, Dropcatch.Com, LLC, Electronic Arts, Inc., Virtual Investments, LLC, All-Pro Fasteners, Inc., Creation Media, LLC, HRJM Business Broker, Kate Spade, Dharshinee Naidu, Quinn Veysey, Alansis Corporation, Media Options, Inc., and many others, in a concerted effort to facilitate the enterprise's attempt to takeover of the assets of the Village Trust and of Novo Point LLC and Quantec LLC and to thwart the Court orders recognizing the authority of Lisa Katz as the authorized operations manager of Novo Point LLC and Quantec LLC and

authorizing her exercise of control over the assets of Novo Point LLC and Quantec LLC.

**9.3.4.8.** Suits against many of the preceding parties were filed and maintained by the Baron group, though the shell entity called "Associated Recovery, LLC", <u>after</u> the Collin County District Court adjudicated and dismissed with prejudice the Baron group's challenge to Katz' authority. The shell entity Associated Recovery, LLC, was formed immediately after the Collin County clerk of court filed an order adjudicating claims against Baron, et. al., in the Collin County lawsuit.

**9.3.4.9.** Thus, when the Collin County court adjudicated the Baron group's claim challenging Katz' authority against the Baron group, the Baron group proceeded to create a shell entity in order to file fraudulent, vexatious actions against a long list of defendants around the globe– on the knowingly false and fictitious pretense that the Baron group was authorized to control the assets, in place of Katz.

**9.3.4.10.** The activity of the enterprise described above has been unabated since 2014 and continues to this day, causing damage and injury to victims around the globe.

**9.4.  The enterprise is one affecting interstate commerce:**

**9.4.1.** As pleaded above, the enterprise is one affecting interstate commerce. The enterprise interferes with the commercial activity of thousands of domain names which involve thousands of websites and hundreds of thousands of dollars of interstate business and commerce.

**9.4.2.** The domain names involved are accessed by millions of visitors seeking to engage in interstate commerce.   On behalf of the enterprise,

Rightside Group has locked the domain names to websites that engage in interstate commerce by providing interstate advertising over the internet.

**9.4.3.** The actions of Rightside on behalf of the enterprise have and are continuing to prevent the operation of hundreds of websites from engaging in interstate commerce.

**9.5.  Defendants are employed by or associated with the enterprise:**

**9.5.1.** As pleaded above, Rightside was employed by the enterprise to interfere with the U.S. District Court′s order that Lisa Katz have control over the receivership domain name assets registered through a Rightside subsidiary, name.com.

**9.5.2.** Rightside was also employed to delay enforcement action related to enterprise's interference with the Court′s orders by engaging in a pattern of wire fraud with respect to Rightside′s activities on behalf of the enterprise.

**9.5.3.** Rightside was further employed by the enterprise to transfer to the enterprise insider information known or acquired by Rightside relating to the domain names registered to Domain Vault LLC.

**9.6.  Participation in the conduct or affairs of the enterprise:**

**9.6.1.** As pleaded above, Rightside is participating in the conduct or affairs of the enterprise and directed its subsidiary, name.com, to disregard the District Court′s order granting Katz control over the domain names, and to act to thwart the Court′s orders by interfering with Katz′ transfer of domain names.

**9.6.2.** Rightside also directed its subsidiary, name.com to lock the ′DNS′ records to effectively hijack control of the domain names in defiance of the Court′s orders directing that Katz′ authority be recognized. The DNS controls

to where the domain resolves– what webpage is shown when the name is entered in a browser.   Rightside thereby took over control of the domain names so that they were monetized with advertisements with all income deposited with Rightside or a subsidiary.

**9.6.3.** Rightside also participated in conducting the enterprise's affairs to delay enforcement action related to the interference with the Court's orders by engaging in a pattern of wire fraud, as pleaded below, and transferring private information acquired by Rightside's subsidiary relating to the domain names to the enterprise.

**9.6.4.** Rightside's participation in the enterprise was critical to the success of the enterprise.  The U.S. District Court, (and Texas state court), denied the Baron group's repeated motions for injunction and temporary restraining orders to prevent Katz from selling the domain names.   The Collin County District Court dismissed with prejudice the Baron group's claims challenging Katz' authority and seeking return of the domain names sold to Domain Vault LLC.   Accordingly, only <u>through Rightside's participation was the enterprise able to thwart the court orders and interfere with Katz' control over the domain names</u>.

**9.6.5.** Upon information and belief, <u>Rightside also provided the Baron group with private information</u> concerning the prior sale of domain names registered with name.com in order to enable the Baron group to file frivolous suits, as pleaded above.  Notably, a series of orders were been issued to prevent Baron from obtaining the information about domain name sales, specifically to prevent Baron's harassment of the purchasers.

**9.7. Pattern of racketeering activity involving two or more predicate acts:**

**9.7.1.** Pursuant to the rulings of the Supreme Court, to prove a pattern of racketeering activity a plaintiff must show (i) racketeering predicates which are (ii) related and (iii) amount to or pose a threat of continued criminal activity. *HJ Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989).   Conduct forms a pattern if it embraces acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics. *Id.* at 240.

**9.7.2.** Predicate acts of wire fraud**:**

**9.7.2.1.** 18 U.S. Code § 1343 prohibits a party intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses or promises, from transmitting or causing to be transmitted by means of wire, communication in interstate or foreign commerce, any writings or signals, for the purpose of executing such scheme or artifice. Pursuant to the rulings of the Supreme Court, the elements of the offense fraud communications are (1) a scheme to defraud, and (2) a communication in furtherance of the scheme. *See Pereira v. United States*, 347 U.S. 1, 8, 14 (1954).

*Two schemes to defraud*

**9.7.2.2.** As pleaded above, Rightside Group devised and operated two distinct schemes to obtain money and property by false pretenses and promises.  The two schemes were both based on false pretenses or promises.

**9.7.2.3.** The first scheme involved the pretense that Rightside's freeze of Domain Vault LLC's domain names was pursuant to ICANN (Internet Corporation for Assigned Names and Numbers) rules and policies.

**9.7.2.4.** The second scheme involved the pretenses that (a) the reason Rightside directed Domain Vault′s domain names to be frozen was to allow the Collin County District Court to adjudicate the Baron group′s claims contesting Katz′ authority and sale of names to Domain Vault and (b) when the Collin County suit was adjudicated, the lock would be lifted.

**9.7.2.5.** The purpose of the first scheme was to prevent Domain Vault from transferring the domains to another registrar, (which would not participate in the Baron group's scheme to interfere with the sale of the assets), and to induce Domain Vault to make continuing monthly payments to Rightside′s subsidiary, name.com, for continued registration of the domain names.

**9.7.2.6.** The purpose of the second scheme was to delay Domain Vault from taking legal action to unlock the domain names registered to Domain Vault LLC.

**9.7.2.7.** In furtherance of its first scheme, Rightside Group used the false pretense that the ICANN rules and the agreements incorporating those rules, allowed Rightside to freeze the domain names based on the Collin County litigation and prevented the transfer of the domain names to another registrar during the pendency of the case. The pretense was false and known to be false to Rightside Group.

**9.7.2.8.** Likewise, in its second scheme, Rightside Group′s pretense that the lock would be lifted when the Collin County suit was adjudicated was false and known to be false by Rightside Group.

*Wire transmissions in furtherance of the schemes*

**9.7.2.9.**  In furtherance of each of the schemes pleaded above, Rightside Group transmitted by means of interstate wire, to wit: the internet, and caused to be transmitted by the same means, communications in interstate commerce.   Specifically, Rightside Group made the false representations pleaded above and also directed its subsidiary, name.com, to make representations in emails and by phone in furtherance of Rightside Group's schemes.

**9.7.2.10.** Thus, for example, in addition to the communications pleaded in section 8.5 above, on or about April 25, 2014, Rightside Group directed employees of name.com to send an email to Lisa Katz in Dallas Texas stating that "We have recently been provided the attached court filing in the district county court of COLLIN COUNTY, TEXAS, no. 401-01512-201 The attached petition seeks an order of the court to determine the existence of the Village Trust, Novo Point, LLC, Quantec, LLC and the authority of Mr. McNair.  The domain names in the XXXXXXX account have been frozen until the conclusion of the litigation".

**9.7.2.11.**  Similarly, on or about October 20, 2015, Rightside Group caused an email to be sent to the World Intellectual Property Organization and counsel for Woman's World Magazine, who– because Rightside Group had prevented Domain Vault LLC from operating an internet business at the domain name's website– was challenging Domain Vault LLC's right to own the generic domain name "womansworld.com.  In the email, based on instruction from Rightside Group, Rightside's subsidiary name.com stated that the domain name was frozen pending the litigation in "Novo Point,

LLC and Quantec, LLC vs. Elisa Katz, Christopher A. Payne, Sandler Siegel PLLC, Domain Holdings Group, Inc., Fabulous PTY, Name.com, Inc., and Does 1-15 (Case No. 401-01512-2014) pending before the 401st Texas District Court in Collin County, Texas".

**9.7.2.12.** Further, for example, on December 5, 2016, Rightside Group caused to be emailed via the internet to counsel for Domain Vault LLC in Dallas Texas an email stating that Rightside Group's research shows that the Collin County litigation is still open; and as such, Rightside was not in a position to remove its pending litigation lock.

**9.7.2.13.** These communications were made in furtherance of the schemes pleaded above.

**9.7.3.** <u>Predicate act of extortion:</u>

**9.7.3.1.** Pursuant to Texas law, the offense of extortion is included in the consolidated offense of "theft". Tex. Penal Code §31.02.   A person commits an offense if he exercises control over property with consent induced by coercion. *See* Tex. Penal Code §§31.02, 31.0

**9.7.3.2.** Rightside Group exercised control over the domain names registered to Domain Vault LLC and secured monthly registration payments from Domain Vault LLC from 2014, 2015 and 2016, by threatening that if Domain Vault LLC did not continue to make payments to Rightside Group's subsidiary name.com, that instead of transferring the domain names to another registrar, Rightside Group would cause the destruction of Domain Vault LLC's registration of the domain names.   Rightside Group thereby coerced thousands of dollars in monthly payments from Domain Vault LLC each month.

**9.7.4.** <u>Predicate act chargeable under stale law involving dealing in obscene matter:</u>

**9.7.4.1.** Pursuant to Texas law, a person commits an offense punishable by imprisonment for more than one year if he (i) exercises control over property of another worth more than $2,500.00 (ii) without the effective consent of the owner, including consent induced by confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true. *See* Tex. Penal Code §§31.02, 31.0

**9.7.4.2.** From 2014, and continuing to this date, Rightside Group, without the effective consent of Domain Vault LLC, exercised and continues to exercise control over the domain name "freesextv.com" that is owned by Domain Vault LLC.  The domain name is worth more than $2,500.00. Rightside Group controlled the domain name to point to a pornography website offering sex services over the internet with links to obscene and sexually explicit material depicting high school children in various sex acts. Rightside exercised control over the domain name registered to Domain Vault LLC– and without the consent of Domain Vault LLC, pointed the domain name to sell obscene sex services over the internet.

**9.7.4.3.**  Profit from the website was deposited into the bank accounts of Rightside Group or a subsidiary thereof.

**9.7.4.4.**  The actions of Rightside Group in exercising control over the domain name "freesextv.com" are actions involving the dealing in obscene matter and because taken without the consent of the owner of the domain name, are actions chargeable under State law and punishable by

imprisonment for more than one year.

**9.7.5.** <u>Relatedness:</u>

**9.7.5.1.** The racketeering predicated pleaded above involved the same purpose and distinguishing characteristics.  As pleaded above,  the purpose of the acts committed by Rightside Group was to assist the Baron group in thwarting the orders of the U.S. District Court and to assist the Baron group in interfering with Katz' control over the assets of Novo Point LLC and Quantec LLC and sale of domain names to Domain Vault LLC.

**9.7.5.2.** In committing its criminal acts above pleaded, Rightside Group used similar methods of commission: seizing control of domain names registered to Domain Vault LLC and relying on fraud, fraudulent promises, and threats delivered on interstate wire via the internet.  The acts complained of both relate to the same scheme, and as pleaded above, share similar methods of commission.

**9.7.6.** <u>Amount to or pose a threat of continued criminal activity:</u>

**9.7.6.1.** Rightside engaged in a pattern of racketeering activity as detailed above, involving multiple victims and multiple related schemes, all of which are related to the same purpose of interfering with the US District Court's orders that Katz have control over the receivership domain name assets registered through a Rightside subsidiary in order to assist the Baron group in attempting to appropriate those assets.

**9.7.6.2.** Rightside Group has acted, as pleaded above, as though it believes it is beyond the reach and jurisdiction of the courts.  As pleaded above, Rightside Group has engaged in a pattern of disregard for the orders of the U.S. District Court and has engaged in a continuing pattern of fraud

directed at multiple parties, whereby Rightside Group unlawfully appropriates control over property and engages in a continuing pattern of wire fraud to knowingly misrepresent that its actions in compliance with ICANN rules.

**9.7.6.3.** Left to its own devices, based on its pattern of action, as described in this complaint, Rightside has and clearly will continue its criminal activities. Likewise, Rightside Group appears deeply invested in the scheme in which Rightside fraudulently represented that the ICANN rules permit it to disregard the Court's orders, freeze the assets and prevent their transfer to another registrant or registrar. Rightside Group has stated in so many words that it is not going to cease its pattern of activity unless a court steps in and orders it to.

### 9.8. Proximate Damages:

**9.8.1.** Domain Vault LLC was injured in its business and property by reason of the violations of section 1962 pleaded above. Through its actions in violation of section 1962 pleaded above, Rightside Group proximately caused the damages pleaded above to Domain Vault LLC.

**9.8.2.** Rightside's fraudulent schemes to convince Domain Vault LLC that its actions were authorized by the ICANN rules and that the lock imposed would be lifted when the court ruled in the Collin County case, (and later that the lock would be lifted when the Clerk administratively closed the case), proximately led Domain Vault to delay enforcement action against Rightside, and proximately caused the injury to Domain Vault of millions in lost income from the loss of operation of thousands of websites, and for damages due to the decreased value of domain name assets and lost sales relating to those assets.

## COUNT V

## CONVERSION

**10.1.** Domain Vault LLC pleads jointly and in the alternative a claim for conversion.

**10.2.** Pursuant to Texas law, to establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had entitlement to control of property; (2) the defendant exercised control over the property inconsistent with the plaintiff's rights as an owner; (3) the plaintiff demanded return of control of the property; and (4) the defendant refused to return control of the property. *Lawyers Title Co. v. JG Cooper Dev., Inc.*, 424 S.W.3d 713, 718 (Tex.App.– Dallas 2014). Under Texas law, the property converted cannot be purely intangible, such as emails sent to an email account or the website that is loaded at a website address.   However, intangible property is subject to a claim for conversion where (4) an underlying intangible right has been merged into a document and (5) that document has been converted. *Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997).

**10.3.** Domain Vault LLC is the registrant of domain names registered through Rightside Group's subsidiary name.com.  Domain Vault owns the domain names and, as the registrant of the domain names is entitled to control the assets. Domain names are distinct from the websites that the domain names point to. Domain names are intangible personal property wherein the ownership right is merged into a "WHOIS" document.  This document is maintained in electronic form by a domain registrar.  In this case, the domain registrar is name.com which maintains the WHOIS records in electronic form pursuant to the rules of The Internet Corporation for Assigned Names and Numbers, a nonprofit organization that is responsible for coordinating of the internet.

**10.4.**  Rightside Group took control of the underlying WHOIS records and thereby took control over the domain names.  Rightside Group's exercise of control over the domain names was expressly for the purpose of excluding Domain Vault from control.  Rightside achieved this by directing name.com to 'lock-out' Domain Vault from control over the WHOIS records in order to prevent Domain Vault LLC from transferring the domain names to other parties.  Rightside also took control over the 'DNS' records to prevent Domain Vault LLC from controlling to which website each domain name pointed.

**10.5.**  Domain Vault demanded return of control over the domain names but Rightside refused to relinquish its control over the electronic WHOIS and DNS records. The domain names converted by Rightside Group are of fluctuating market value and pursuant to Texas law, the measure of damages is the highest market value of such property between the date of conversion and the filing of the suit. *Imperial Sugar Co., Inc. v. Torrans*, 604 S.W.2d 73, 74 (Tex. 1980).  Upon information, the highest market value of the domain names converted by Rightside Group exceeds $30 Million Dollars.

**10.6.**  Rightside Group's conversion was malicious, taken in contempt of and in disregard of the orders of the U.S. Federal District Court and the adjudication of claims made by the Collin County state district court in Collin County Texas. Accordingly, Domain Vault LLC is entitled to recovery of additional, exemplary damages.

## 11. <u>OTHER MATTERS</u>

**11.1.**   Pursuant to Fed.R.Civ.P. 38, Domain Vault LLC respectfully demands a jury trial.

**11.2.**   All conditions precedent have occurred or have been performed.

**11.3.**   Any inconsistent claims or allegations are pled in the alternative.

## 12. <u>PRAYER</u>

**12.1.** <u>Actual Damages</u>

**12.1.1.** Domain Vault LLC prays for recovery against the defendant, Rightside Group, for the damages caused by Rightside, pleaded above.

**12.2.** <u>Exemplary Damages</u>

**12.2.1.** Domain Vault LLC further prays for recovery against the defendant, Rightside Group for statutory and exemplary damages, as pleaded above.  Exemplary damages prayed for include:

**12.2.1.1.** Exemplary damages for Rightside Group's malicious interference with Domain Vault LLC's contract to purchase domain names subject of this suit;

**12.2.1.2.** Exemplary damages for Rightside Group's malicious conversion of domain names subject of this suit;

**12.2.1.3.**   Exemplary damages for Rightside Group's conspiracy with the Baron group; and

**12.2.1.4.**   Statutory treble damages pursuant to 18 U.S.C. § 1964 (c).

**12.3.** <u>Injunctive Relief</u>

**12.3.1.** Domain Vault LLC further prays for injunctive relief against the defendant, Rightside Group, as pleaded above.

**12.3.2.** Injunctive relief is requested with respect to the state law claims for conversion, interference with contract, and civil conspiracy, and with respect to the suit against Rightside Group to enforce the Court's orders.

**12.4.** Order of Enforcement

**12.4.1.** Jointly and in the alternative to the injunctive relief requested, Domain Vault LLC prays for the entry of an order of enforcement or supplemental enforcement order to enforce the existing orders of the U.S. District Court for the Northern District of Texas.

**12.5.** Attorney's Fees

**12.5.1.** Domain Vault LLC further prays for an award of attorney's fees as allowed by law, including pursuant to 18 U.S.C. § 1964 (c), and state law.

**12.6.** Interest, costs and other relief

**12.6.1.** Domain Vault LLC further prays for an award of pre and post-judgment interest as allowed by law, all costs of court, and for any other relief, both special and general to which it may be justly entitled, including in damages and equitable relief.

Respectfully submitted,

Gary N. Schepps
Texas Bar No. 00791608
5430 LBJ Freeway, Ste. 1200
Dallas, Texas 75240
(972) 200-0000 - Telephone
(972) 200-0535 - Facsimile
legal@schepps.net
Counsel for DOMAIN VAULT LLC